UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GREG SCHMIDT,

     Plaintiff,

v.                                       Case No. 2:08-cv-0076
                                       HON. R. ALLAN EDGAR

UNITED STATES ARMY CORPS OF
ENGINEERS,

     Defendant.

_____/

## **MEMORANDUM**

Plaintiff Greg Schmidt brings this action against the United States Army Corps of Engineers ("Corps") seeking judicial review of the denial of a building permit pursuant to the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"). Plaintiff seeks review of the Corps' denial of a permit to construct a residence and associated facilities on his property in Chippewa County, Michigan. The Corps denied the permit application as "contrary to the overall public interest" pursuant to Section 404(b)(1) of the CWA, 33 U.S.C. §§ 1344(a), 1344(b)(1).

The Corps requests that this court uphold its decision to deny Plaintiff's permit application. [Court Doc. No. 23]. Plaintiff requests that this court find the Corps' decision arbitrary and capricious and remand this matter to the Corps with instructions. [Court Doc. Nos. 19, 24]. Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq,*. the court has reviewed the record and the applicable law and has determined to uphold the Corps' decision to deny Plaintiff's permit.

## I.      Background

The parties do not dispute the material facts in this matter.  The facts are based on

Plaintiff's complaint and the administrative record as filed by the Corps.  Plaintiff's complaint

states the following background facts:

> Plaintiff is the owner of certain real property located in Chippewa County,
> Michigan (hereafter "the project site").  Plaintiff seeks to construct a residence
> and associated facilities on the project site . . . . The [CWA] requires a permit
> from Defendant USACE to perform certain activities affecting the waters of the
> United States. . . .
>
> The project site is located on the shore of the St. Mary's River.  The St. Mary's
> River constitutes "waters of the United States" as that term is defined in 33 CFR
> 328.3(a)(1).  Certain areas of the project site may constitute "wetlands" as defined
> in 33 CFR 328.2(b), which are identified as "waters of the United States" under
> the Act. . . .  The [Michigan Department of Environmental Quality] has issued a
> permit for Plaintiff's project.  In October, 2000, Plaintiff submitted a joint
> application for a permit to the USACE to discharge fill into wetlands on the
> project site.   Via correspondence dated September 18, 2006, USACE's District
> Engineer, Lt. Col. William J. Leedy, informed Plaintiff that the USACE had
> "determined that the project is contrary to the overall public interest" and denied
> Plaintiff's application for a permit under Section 404(1)(b) [sic] of the Clean
> Water Act. . . .
>
> Plaintiffs properly filed an administrative appeal of the USACE's initial
> determination pursuant to 33 CFR 331.5.  Plaintiffs' appeal was heard by the
> USACE Division Engineer according to the procedures set forth in 33 CFR
> 331.9(a).  At the conclusion of the administrative appeal process the USACE's
> Division Engineer issued a decision in this matter pursuant to 33 CFR 331.9(b). . .
> . As set forth in Exhibit B, the USACE Division Engineer remanded this matter to
> the USACE District Engineer with specific instructions to review the
> administrative record, and to further analyze or evaluate specific issues.
> On January 28, 2008, the USACE District Engineer completed his review of the
> administrative record and issued yet another denial of Plaintiff's application.

[Court Doc. No. 1, "Complaint," ¶¶ 5-25].

A review of the administrative record provides additional explanation of the Corps'

decisions.  According to the administrative record, the Plaintiff's proposed project was described

-2-

as follows:

> The applicant has applied for a Department of the Army (DA) permit to discharge approximately 3,372.7 cubic yards of clean fill material in a 22,766 square ft (0.52-acre) wetland area below the Ordinary High Water Mark (OHWM) for the construction of a single family residence with detached garage, deck, septic drainfield and parking/turn around area.  As mitigation, remaining wetlands on the project site would be protected by a conservation easement.

[Court Doc. No. 17, Administrative Record ("AR") 000016].  The record reveals that several previous applications, by both the Plaintiff and the previous owner, for similar residential construction had been denied by the Corps.  *Id.* at 000016-17.  The prior owner had received a permit for a trailer pad and an access drive on the property, but both the Michigan Department of Natural Resources ("MDNR") and the Corps had denied prior requests for residential construction on three previous occasions.  *Id.*

In 1999, for example, an MDNR interoffice communication indicated that "Fisheries Division objects to this project due to the excessive loss of a vital habitat" and that "[s]horeline wetland around the St. Mary's River and Drummond Island is rapidly disappearing."  *Id.* at 000116.  On October 25, 2000 another MDNR interoffice communication summarized its overall view of the site:

> In its present condition with the site generally absent of standing water, it could easily be assumed by an uninformed individual that this is a suitable building site.  However, the site is obviously a coastal wetland, contiguous with the entire Great Lakes system.  In fact, the 1986 aerial photo shows most of the proposed filling site to have standing water. . . . These low water times are a critical time for emergent wetland recovery and expansion.  History tells us that this low water period will not last forever and that high water will return. . . . Given the development that has occurred in the immediate area, it is apparent that this site was not developed due to the wetland characteristics it exhibits.

AR 000123.  As the Corps noted in its 2001 denial:

> [w]e initiated evaluation of several previous development proposals for this site,
> however we did not complete our reviews due to similar denial of a State permit.
> In each instance, issues arose during the process which are prominent in our
> review.  These issues of wetlands, alternatives, fish and wildlife resources, flood
> hazards, floodplain values, conservation, land use, and safety will need to be
> addressed with any development scenario at the site.

AR 000643.

On January 30, 2004 the Michigan Department of Environmental Quality ("MDEQ")

issued a modified permit to the Plaintiff to proceed with his proposed residence and septic area

construction.  AR 000079-81, 000427-429.  Plaintiff then sought the permit at issue in this action

from the Corps.  On August 9, 2004 the Corps asked Plaintiff for additional information to

process his application for a permit.  AR 000718-719.

In identifying the project's purpose, the Corps found that Plaintiff sought to construct a

"single-family dwelling and garage." *Id.*  However, in providing information prior to the Corps'

January 2008 decision, the Plaintiff's attorney emphasized that the Corps' determination of

purpose was too "generic" because the "location was imperative and an important component of

this was a view of commercial shipping traffic." *Id.* at 000017.  Plaintiff's attorney also noted

that "boating access" was also a key project purpose. *Id.*  In response to the specific project

purpose raised by the Plaintiff at the appeal stage, the Corps' January 28, 2008 memorandum

noted:

> Although the applicant criticized the Corps' project purpose, he did not offer a
> substitute.  He identified that aesthetics is a unique and important component,
> along with boating access.  Specifying *one view from a particular vantage unduly
> limits the project purpose*.  Boating access is also a new measure of the project
> purpose, but without a proposed moorage or access structure, there is no way or
> reason to evaluate alternatives to meet this discrete need.  Both of these elements
> were raised after the remand, and alter the purpose of the work sufficiently to be
> considered a new project. *We have determined that the project purpose is
> construction of a residential home on the St. Mary's River.*

-4-

AR 000018 (emphasis added).

Prior to the Corps' initial decision regarding the permit, several federal, state, and local agencies, as well as individual members of the public responded to the public notice issued on October 1, 2004 regarding Plaintiff's proposed project. AR 000089, 000406-409. The United States Fish and Wildlife Service ("FWS") objected to the issuance of the permit based on "anticipated impacts to fish and wildlife resources." *Id.* at 000019, 000419-420. Their objections remained the same in 2004 and in 2007 and 2008. *Id.* at 000019, 99, 101-104. The FWS summarized that "[t]he development of a residence entirely below the [Ordinary High Water Mark ("OHWM")] may lead to landscape level coastal wetland impacts that could dramatically affect migratory birds and other wildlife. We recommend that you not issue a permit for the project as currently proposed." *Id.* at 000099. No tribal objections to the permit were made.

Four individual citizens and neighboring landowners objected to the proposed construction. *Id.* at 000020. In making their objections, two of the residents noted that "[w]e feel that the property is 95% if not all wetlands" and that "[d]uring the 1985/1986 high water levels this property was completely under water including the road and water almost up to our pole barn which is located 20 feet or more from the wetland area is much higher than the wetland [sic]." AR 000129.

On December 2, 2004 the Plaintiff wrote to the Corps to express his frustration with the Corps' modification of its determination of the OHWM. AR 000639-640. He requested that the Corps issue a permit immediately. *Id.* Following the period of public comment, on December 3, 2004, the Corps forwarded Plaintiff the correspondence it had received in response to the public

notice and requested responses to specific issues.  *See* AR 000146-148; 000466-468.  In its letter

requesting additional information on December 3, 2004, the Corps noted:

> [y]our proposed discharge area is a wetland, which the Guidelines accord special
> protections.  The activity which you would carry on in the wetland does not
> require a wetland to take place.  In such a case the guidelines require that we
> presume that your <u>overall project purpose</u> can be accomplished in a way that does
> not involve wetlands, and that any design that does not involve wetlands will have
> less adverse impact on the aquatic ecosystem.  The burden to disprove these
> presumptions is yours, and you have this opportunity to do so.
>
> We have determined that your overall project purpose is to provide a residential
> home on the St. Marys River.  We ask that you consider ways to achieve this
> purpose which would avoid or minimize the discharges in wetlands, and submit
> an analysis of all practicable alternatives to the proposed discharge in wetlands.

AR 000467.

On March 1, 2005 the Corps notified Plaintiff that it had revised the OHWM and wetland

boundary.  AR 000233.  On September 16, 2005 the Plaintiff and his wife responded to the

Corps' December 2004 request for his response to various issues raised.  *Id.* at 000150; AR

000470-472.  Plaintiff also submitted opinions from various experts in support of his proposed

project.  *Id.* at 000155-168.

The record reveals that the Corps denied Plaintiff's initial request for a permit on

September 18, 2006.  AR 000301, 000354-356.  The initial denial states in part:

> After due consideration of the record and the appropriate regulations, we have
> determined that the project is contrary to the overall public interest, and have
> decided to deny your request for a permit.
>
> The entire parcel proposed for development is within the 100-year flood plain of
> the St. Marys River.  On this parcel, the proposed discharge area is in a
> scrub/shrub and emergent wetland complex that is below the ordinary high water
> mark (OHWM) of the St. Marys River.  These wetlands perform many important
> functions related to the maintenance of water quality, flood storage, and sediment
> retention, as well as valuable habitat functions related to the maintenance of
> healthy aquatic, semi-aquatic, and terrestrial ecosystems. . . .

During high water levels, the area provides spawning and nursery habitat for fishes, and nesting and brood raising habitat for waterfowl.  Under low water conditions the site supports small ponds and wetland areas that provide ideal habitat for a variety of plant species adapted for this condition and the populations of amphibians, reptiles, birds and mammals that make use of these areas.  The fluctuation in the level of inundation within these wetlands enhances the diversity of these shoreline areas.

The project as proposed would have long term, adverse impacts on the functions that the site currently provides, including water quality, flood plain values, wetlands, aquatic organisms, wildlife, and conservation.  The proposed project would also construct a residence and wastewater treatment system in an area of known flood potential.  Based on the quality of the resources that would be affected, the benefits of the proposed project do not outweigh the detriments to the public interest.

This decision was also based on an evaluation of the project's compliance with the 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material. . . . One critical threshold of the Guidelines is a thorough consideration of less damaging practicable alternatives.  For projects such as yours, the Guidelines require that we presume that less damaging alternatives are available unless clearly demonstrated otherwise.  In your case, we presume that both on-site and off-site options are available, including use of other property that you own, or could purchase.  You have not overcome this presumption, and therefore your project does not comply.

AR 000354-356.

On November 14, 2006 Plaintiff's attorney appealed the decision to deny the permit.  AR 000301.  On October 24, 2007 a Brigadier General of the United States Army issued his review of the Corps' initial decision and found that it was not supported by the administrative record. *Id.*  He ordered the Corps to reconsider its initial denial and to provide further documentation in support of its decision.  *Id.*  The order of reconsideration states in part:

I encourage you to engage the applicant in discussion to pursue a resolution that satisfied the interests of the applicant and upholds our Regulatory responsibility to protect the public interest.  Specifically, I encourage you to confirm with the appellant the areas he intends to fill and focus your attention on documenting and evaluating any potential significant national issues of overriding importance.  This last point is important since your initial decision represents a decision contrary to

a decision issued by the State.

AR 000303.  In his administrative appeal decision, the Brigadier General summarized the

Plaintiff's and prior landowner's previous efforts to develop the land:

> There have been multiple previous applications for residential development on the project site.  In June 1991, the previous owner applied for a state permit to fill 0.29 acre and was denied by the state of Michigan ("the state").  In June 1993, the previous owner was issued a permit by the state for fill to construct a trailer pad and access drive.  In June 1994, the Detroit District ("District") issued the previous owner an after-the-fact permit authorizing the access drive. In September 1998, the appellant submitted a permit application to the state and the District to fill 0.46 acre to construct a residential home.  The state denied the appellant a permit in December 1998 and adhering to Corps regulations at 33 CFR 320.4(j)(1), the District immediately denied the appellant's request "without prejudice".  The appellant then appealed the state's decision and in June 1999, the state's denial was upheld.  In October 2000, the appellant applied for a permit to fill 0.3 acre to construct a residential home.  This request was once again denied by the state, denied without prejudice by the District, and appealed (to the state) by the appellant.  In January 2004, the state issued a modified permit to the appellant to fill 0.19 acre (state) wetlands to construct a residential home and attendant features (e.g. deck, garage, septic system, driveway).

AR 000306.  The lengthy appellate opinion directed the Corps to reconsider its practicable

alternatives analysis based on the State of Michigan's grant of a modified permit and to

reconsider its determination that the project would increase erosion and affect flood hazards, as

well as affect aquatic organisms, wildlife, wetlands, ecology, conservation, and recreation.  AR

000305-325,

On January 2, 2008 the Corps requested additional information from Plaintiff.  *Id.*  The

Corps reiterated its finding that the purpose of Plaintiff's project was to "provide a residential

home on waterfront property along the St. Marys River."  *Id.*  The letter to Plaintiff informed him

that he bore the burden of demonstrating that no practicable alternatives existed.

On January 14, 2008 the Chippewa Ottawa Resource Authority, a representative of five

Native American tribes, drafted a letter to the Corps indicating their objection to the Plaintiff's

project due to the fact that the "particular area has been identified as an important fish spawning

area." AR 000271.  On January 17, 2008 the Plaintiff issued supplemental information regarding

his appeal to the Corps and raised for the first time his desire for a specific view and boat access.

AR 000067-73, 55.

On January 28, 2008, the Lieutenant Colonel upheld his original decision to deny a permit

to discharge fill materials into the wetlands adjacent to the St. Marys River on Plaintiff's

property.  AR 000004-5.  The summary decision states in part:

> The project as proposed would have long term, adverse impacts on the functions
> that the site currently provides, including water quality, wetlands, aquatic
> organisms, wildlife, and conservation.  The proposed project would also construct
> a residence and wastewater treatment system in an area of known flood potential.
> Based on the quality of the resources that would be affected, the benefits of the
> proposed project do not outweigh the detriments to the public interest. . . .
>
> One critical threshold of the Guidelines is a thorough consideration of less
> damaging practicable alternatives.  For projects such as yours, the Guidelines
> require that we presume that less damaging alternatives are available unless
> clearly demonstrated otherwise.  In your case, we presume that both on-site and
> off-site options are available, including use of other property that you own.  You
> have not overcome this presumption, and therefore your project does not comply.

*Id.*

> In analyzing the site, the Corps reviewed the OHWM of the area and noted that:
>
> The entire site is located within an area identified on the Flood Insurance Rate
> Map as being located within a special flood hazard area that would be inundated
> by a 100 year flood event. . . . Based on a review of historic water levels for the
> project site the location proposed for installation of the drainfield has been
> inundated a total of 11 times since 1918 with the most recent inundation occurring
> in 1997.  The water level has exceeded the OHWM elevation of 581.5 ft
> [International Great Lakes Datum ("IGLD")] five (5) times during the period of
> record, with the highest water level elevation for Lake Huron occurring in 1986,
> when the water levels reached 582.35 ft IGLD 1985.

AR 000022.  Although MDEQ issued a permit for the construction, the Corps' memorandum

notes that "the State of Michigan used an elevation one foot lower than the Corps, which limited

the extent of work under State authority to 0.19 acre."  AR 000019. The Corps also noted the

biological richness of the site with "periods of fluctuating water levels" "that provide excellent

habitat for aquatic organisms from a variety of niches," as well as a variety of birds and

mammals.  *Id.* at 000024.

      In its 2008 decision the Corps reviewed its permit decisions for the surrounding area for

the 25 years preceding its decision regarding Plaintiff's property.  In conducting such analysis, it

noted that it had issued 37 permits out of 72 regulatory actions.  AR 000032.  It summarized that

"[t]he total fill authorized for the 37 actions was approximately 3.181 acres, and the average size

of authorized fills was 0.086 acre."  *Id.*  It further emphasized that "[a]pplications for discharge

of fill waterward of the OHWM for residential development have virtually all been denied by the

State."  *Id.*  The Lieutenant Colonel further explained that although the Corps had authorized

construction of other residences in the area, the differences between the other proposals and the

Plaintiff's proposal were twofold:

> First, the authorized residential construction has been in wetlands adjacent to the
> navigable water, rather than in the navigable water itself.  Second, the size of the
> authorized work is an order of magnitude less than the current proposal.  The
> average size of work authorized is 0.059 acre, while the current application
> proposes impacts to 0.52 acre.

AR 000008.

      In its review of the proposal, the Corps carefully reviewed information supplied by the

Plaintiff supporting his proposal.  *See e.g.,* AR 000034-36.  The agency addressed the issues

raised by Plaintiff's environmental experts and noted that several of the experts did not provide

site specific data and failed to demonstrate that the proposed project met their own recommended

specifications.  *Id.*  For example, it found "no merit" in one response based on the project's

failure to meet the expert's own recommended 75 foot distance from open water.  *Id.* at 000035.

> The Corps summarized:

> [t]he proposed discharge of fill material into 0.52 acre of wetland would destroy
> or adversely impact an area that filters rainfall, runoff, and floodwaters that would
> otherwise directly enter the waterway, and would replace it with a new source area
> for runoff pollutants.  Pollutants from this area may include lawn fertilizers,
> herbicides, pesticides, road salt, oil, grease, and septic runoff/leachate.  This
> would cause a long-term negative impact on water quality.  Destruction of
> wetlands by filling will remove their buffering/cleansing ability.  Numerous
> projects such as this could seriously reduce water quality, habitat, and overall
> value of the cumulative impact area, although we view the potential cumulative
> impacts as unlikely due to the rarity of the treatment systems waterward of the
> OHWM.

AR 000036.  In addition to "minor, long term, negative impacts on water quality," the Corps also

found "minimal, long term, negative impacts on flood hazards and floodplain values," wildlife,

wetlands, conservation, overall ecology, and recreation.  AR 0000036, 39, 43, 45, 47, 50.  The

agency also found minor, long term, and positive impacts on the local economy and the private

right of ownership.  *Id.* at 0000050-51.

> Although Plaintiff rejects these suggestions as impracticable, the Corps proposed some

project modifications that would cause less damage to the wetland area.  *Id.*  In addition to

potential modifications of the project design on the proposed site, the Corps also noted that:

> [t]he applicant, at the time of purchase of the proposed project site, owned a
> waterfront home approximately 2,400 ft (0.45 miles) across the bay, located at
> 20131 East Paradise Point Road.  As of September 13, 2006 the Chippewa County
> Equalization Office identifies that the applicant remains the registered owner of
> 20131 East Paradise Point Road and two adjacent lots, for a total water frontage
> of 225 ft on the three lots.

AR 000054.  The decision noted that the Plaintiff's three other waterfront lots were

"predominately upland in character, and either collectively or individually provide a potentially

less damaging alternative to the currently proposed project site."  Although Plaintiff dismisses

these options as unsuitable for his purpose, the Corps determined that the residence needs, as

well as the boat access and aesthetic view could all be satisfied on one of Plaintiff's other upland

lots.  *Id.*  Based on its analysis, the Corps concluded that the Plaintiff had not demonstrated that

less damaging practicable alternatives existed.  *Id.* at 0000057-58.

The Corps' analysis included review and consideration of several materials provided by

Plaintiff, his attorney, and various experts working on his behalf.  *See* AR 000067-84.  However,

even following the Brigadier General's admonition that it carefully review its decision in light of

the MDEQ's permit for development and various issues raised by Plaintiff that appeared to have

merit, the Corps determined to deny Plaintiff the permit for his proposed project.  It is from this

second denial of the permit that Plaintiff appeals.

## II.     Standard of Review

Pursuant to the APA, "[a] person suffering a legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof."  5 U.S.C. § 702.  The APA provides that a court may set

aside administrative agency findings for only limited reasons.  Defendants argue that their

decision should only be overturned to the extent that it was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

The U.S. Supreme Court created a test for the judicial review of an agency construction

of a statute in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837,

104 S.Ct. 2778 (1984).  In that case the Court explained:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determined Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . . We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."

*Id.* at 842-843, 104 S.Ct. at 2781-2782 (quoting *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943)).

Federal courts conducting review of agency decisions have described the arbitrary and capricious standard in this way:

An agency's rule would be arbitrary and capricious if the agency relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. [ ] Although our inquiry into the facts is to be searching and careful, *this court is not empowered to substitute its judgment for that of the agency*. [ ]

*Michigan Gambling Opposition (MichGO) v. Norton*, 477 F.Supp.2d 1, 8 n.10 (D.D.C. 2007)(quoting *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287-88 (4th Cir. 1999)).

Additionally, a court:

must determine whether the agency's final determination 'was based on a

> consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but "the ultimate standard of review is a narrow one." While this standard requires deference to agency decisions, deference does not "shield [an agency's] action from a thorough, probing, in-depth review."

*Stop the Pipeline v. White*, 233 F.Supp.2d 957, 964 (S.D. Ohio 2002) (quoting *Citizens to Preserve Overton Park*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). Further, "[w]hile the court may not supply a basis for the agency decision, a decision 'of less than ideal clarity' will be upheld 'if the agency's path may reasonably be discerned.'" *Slagle v. United States*, 809 F.Supp. 704, 711 (D. Minn. 1992)(quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys. Inc.*, 419 U.S. 281, 285-86 (1974)); *Smereka v. Glass*, No. 89-72068, 945 F.2d 405, 1991 WL 188154 *3 (6th Cir. Sept. 24, 1991) (giving agency decision a "presumption of regularity").

Federal courts also defer to the scientific judgments of agencies tasked with interpreting environmental data. For example, in *Frances Broaddus Crutchfield v. County of Hanover, Virginia*, the Fourth Circuit noted:

> [p]articularly with environmental statutes such as the Clean Water Act, the regulatory framework is exceedingly "complex and requires sophisticated evaluation of complicated data." We therefore do not "sit as a scientific body" in such cases, "meticulously reviewing all data under a laboratory microscope." Rather, if the agency "fully and ably explain[s] its course of inquiry, its analysis, and its reasoning sufficiently enough for us to discern a rational connection between its decision-making process and its ultimate decision," we will let its decision stand.

325 F.3d 211, 218 (4th Cir. 2003) (quoting *Trinity Am. Corp. v. Envir. Protection Agency*, 150 F.3d 389, 395 (4th Cir. 1998)) (other quotations omitted); *see also, State of New York v. Reilly*, 969 F.2d 1147, 1150-1151 (D.C. Cir. 1992) (noting that court is "particularly deferential when reviewing agency actions involving policy decisions based on uncertain technical information");

-14-

*Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1527 (10th Cir. 1992).  In addition, "even if the evidence supports both sides of an issue," federal courts "will sustain the agency 'if a reasonable person could come to either conclusion on that evidence.'" *Reilly*, 969 F.2d at 1150 (quoting *Public Citizen Health Research Group v. Tyson*, 796 F.2d 1479, 1485 (D.C. Cir. 1986)).

### III.    Analysis

Congress initially enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  *See also*, *United States v. Cundiff*, ___ F.3d ___, 2009 WL 249095 *3 (6th Cir. Feb. 4, 2009).  The CWA prohibits the "discharge of any pollutant by any person" except as specifically permitted in the Act.  33 U.S.C. § 1311(a).  Discharges of pollutants include "any addition of any pollutant to navigable waters from any point source. . . ."  33 U.S.C. § 1362(12)(A).  A "pollutant" is defined in part as "dredged spoil, solid waste, incinerator residue, sewage, garbage, . . . rock, sand, cellar dirt . . . discharged into water."  33 U.S.C. § 1362(6).  The term "navigable waters" means "waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  There remains much confusion among the federal courts regarding the meaning of the term "navigable waters," *see Cundiff*, 2009 WL 249095 at *5 (describing complexity of issue described in *Rapanos v. United States*, 547 U.S. 715 (2006)).  However, in this case, the plaintiff does not dispute the fact that his proposed project would involve filling a navigable water of the United States within the meaning of the CWA.  *See* Complaint.

Pursuant to 33 U.S.C. § 1344(a), the Secretary of the Army, through the Army Corps of Engineers, may "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. §

1344(a).  The permit process is governed by Corps regulations.  Agency regulations identify

several factors which the Secretary will consider when determining whether to issue a permit.

*See e.g.,* 33 C.F.R. § 320.4.  For example, the regulations maintain that

> [a]ll factors which may be relevant to the proposal must be considered including
> the cumulative effects thereof: among those are conservation, economics,
> aesthetics, general environmental concerns, wetlands, historic properties, fish and
> wildlife values, flood hazards, floodplain values, land use, navigation, shore
> erosion and accretion, recreation, water supply and conservation, water quality,
> energy needs, safety, food and fiber production, mineral needs, consideration of
> property ownership and, in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a)(1).

The regulations emphasize also that "[m]ost wetlands constitute a productive and

valuable public resource, the unnecessary alteration or destruction of which should be

discouraged as contrary to the public interest."  33 C.F.R. § 320.4(b)(1).  The regulations define

"wetlands" as "those areas that are inundated or saturated by surface or ground water at a

frequency and duration sufficient to support, and that under normal circumstances do support, a

prevalence of vegetation typically adapted for life in saturated soil conditions.  Wetlands

generally include swamps, marshes, bogs, and similar areas."  33 C.F.R. § 328.3(b).

Importantly for this action, the regulations contain a prohibition on discharges of dredge

or fill material in certain circumstances in which a practicable alternative exists:

> (1)  Except as provided under section 404(b)(2), no discharge of dredged or fill
> material shall be permitted if there is a practicable alternative to the proposed
> discharge which would have less adverse impact on the aquatic ecosystem, so
> long as the alternative does not have other significant adverse environmental
> consequences. . . .
>
> (2) An alternative is practicable if it is available and capable of being done after
> taking into consideration cost, existing technology, and logistics in light of overall
> project purposes.  If it is otherwise a practicable alternative, an area not presently
> owned by the applicant which could reasonably be obtained, utilized, expanded or

managed in order to fulfill the basic purpose of the proposed activity may be considered.

40 C.F.R. § 230.10(a)(1)-(2).  The regulations further explain that:

> [w]here the activity associated with a discharge which is proposed for the special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.  In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

40 C.F.R. § 230.10(a)(3).  The regulations further define "wetlands" as "special aquatic sites."

*See* 40 C.F.R. § 230.3(q-1); 40 C.F.R. § 230.41.  As one district court explained it, "the guidelines couple a general presumption against all discharges into aquatic ecosystems with a specific presumption that practicable alternatives to the fill of wetlands exist."  *Hough v. Marsh*, 557 F.Supp. 74, 82 (D. Mass. 1982).  The purpose of the regulations "is to create an incentive for developers to avoid choosing wetlands when they could choose an alternative upland site." *Bersani v. United States Envir. Protection Agency*, 850 F.2d 36, 44 (2d Cir. 1988).

As one court has noted, "[c]entral to evaluating practicable alternatives is the determination of a project's purpose."  *The National Wildlife Federation v. Whistler*, 27 F.3d 1341, 1345 (8th Cir. 1994); *see also, Florida Clean Water Network v. Grosskruger*, 587 F.Supp.2d 1236, 1243 (M.D. Fla. 2008).  With respect to a review of a permit application for soybean farming the Fifth Circuit remarked, "the Corps has a duty to take into account the objectives of the applicant's project.  Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable."  *Louisiana Wildlife Fed'n v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985).

One federal district court aptly summarized the differences between a project's basic purpose and a project's overall purpose, which may be more highly specific:

> Initially, the Corps determines a project's "basic purpose" to assess whether the activity associated with the project is water dependent (such as a permit to build a marina) or not (such as a permit to build a hospital).  40 C.F.R. § 210.10(a)(3). Where a project's basic purpose is not water dependent, the Corps will steer the project toward alternatives that do not involve discharges into wetlands. . . . Once the basic purpose is determined, the Corps analyzes practicable alternatives in light of a project's "overall purpose," which is more particularized to the applicant's project than is the basic purpose, and reflects the various objectives the applicant is trying to achieve.  In evaluating alternatives to a proposed project, an alternative may be deemed to be practicable even if it does not meet all of a project's components provided that any component it fails to meet is deemed to be "incidental" to the project's basic purpose. . . . the definition of a project purpose may not be used by the sponsor as a tool to artificially exclude what would otherwise be practicable alternatives to the project in other words, the sponsor's project purpose must be "legitimate."  Thus, the project purpose may not be defined so narrowly that it "make[s] what is [a] practicable [alternative] appear impracticable," yet the Corps cannot ignore a sponsor's "genuine and legitimate" conclusions regarding the importance of a proposed project.

*Grosskruger*, 587 F.Supp.2d at 1243-44 (citing *Sylvester v. United States Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989)) (other citations omitted).

In analyzing whether a particular plan of development requiring a permit has a basic purpose which is water-dependent, courts routinely analyze only the broad purpose of the proposal.  For example, in *Slagle v. United States*, the developer plaintiff's proposal of developing shoreline lots for residential housing was not deemed to be "water dependent" and did "not require access or proximity to a special aquatic site (such as a wetland) to fulfill its basic purpose."  809 F.Supp. at 713.  *See also, Hough v. Marsh*, 557 F.Supp. 74, 76, 83 (D. Mass. 1982) (determining that plan to build two residential houses and a tennis court were not water dependent); *Smereka*, 1991 WL 188154 at *6 (finding that Corps' determination that plaintiff's proposal to build a house on wetlands was not water dependent was not irrational); *O'Connor v.*

-18-

*Corps of Engineers, U.S. Army*, 801 F.Supp. 185, 194-96 (N.D. Ind. 1992) (upholding Corps'
denial of permit to build track, tennis court, swimming pool in wetland area due to plaintiff's
failure to demonstrate lack of practicable alternatives); *cf. Whistler*, 27 F.3d at 1345 (noting that
primary purpose of proposed project was water dependent because it was boat access for a
residential development which was being constructed upland without the need for a CWA
permit).

As the Eighth Circuit noted in *Whistler*, "[t]he cumulative destruction of our nation's
wetlands that would result if developers were permitted to artificially constrain the Corps'
alternatives analysis by defining the projects' purpose in an overly narrow manner would
frustrate the statute and its accompanying regulatory scheme." 27 F.3d at 1346. In *Korteweg v.
Corps of Engineers of U.S. Army*, the district judge upheld the Corps' denial of a permit for six
residential units situated on waterfront property. 650 F.Supp. 603 (D. Conn. 1986). The court
noted that the plaintiff developer maintained the burden to prove the unavailability of alternative
sites. *Id.* at 604. In granting the Corps' motion for summary judgment, the court noted:

> [c]ontrary to plaintiff's claim, the record need not show the availability of sites
> reasonably obtainable and usable as plaintiff desired. Plaintiff mistakes the cast of
> the procedure. He has no fixed right to locate a residential project, nor the right to
> put it on his choice of aquatic sites. The question is whether the site involved may
> be despoiled from an aquatic environmental view if the same project can be
> reasonably located elsewhere with substantially less adverse environmental
> impact.

*Id.* at 605. In finding that the project was not water dependent, the court noted that:

> [t]he project is not made unique for environmental purposes by including a slip
> for each unit. In certain quarters, the ability to tie one's boat at an adjacent dock
> would make the units more valuable and thus more integral to their residential
> use. . . . The slips do not meet a need of residents. At best, they provide an
> incidental accommodation to the potential wishes of a portion of the real estate
> market. The finding that the units are non-water dependant and the severability of

-19-

the docks is soundly based in the record and is accepted.

*Id.* at 605.

In a case somewhat analogous to this one, a developer sought review of a Corps decision denying its application for a permit to build a waterfront townhouse community with a boat storage and launching area. *Shoreline Assocs. v. Marsh*, 555 F.Supp. 169 (D. Md. 1983). Members of the public, as well as the Environmental Protection Agency, and the United States FWS opposed the development. *Id.* at 172. The consulting agencies had a primary concern "that greater utilization could be made of the upland portions of the plaintiff's property without destroying protected wetlands." *Id.* at 174 n.22. The court determined that the boat storage and launch facilities were incidental to the project's basic purpose, which was residential housing. *Id.* at 179. In granting the Corps' motion for summary judgment, the district court noted:

> The Corps, as well as each of the consulting agencies, concluded that [plaintiff] had alternatives available to it because the townhouse community could be constructed on upland property belonging to [plaintiff]. [Plaintiff's] contention that this is untrue, because its project is designed to maintain the park-like atmosphere of the upland areas and because the project is dependent on construction of a boat storage area and launch, is untenable. The primary aspect of the proposed project is the construction of a townhouse community, not the construction of a boat storage facility and launch which is incidental to it. [Plaintiff] has failed to show, in compliance with the regulations, why it is necessary for the townhouses to be located on the wetlands rather than the uplands, except for its preference to build on the wetlands.

*Id.* at 179.

The court concludes that this case is analogous to the situation faced by the district court in *Shoreline Assocs.* 555 F.Supp. at 179. Although Plaintiff complains that the Corps' determination of the basic purpose of his proposed project is too narrow or generic, it is the Corps' duty to determine a purpose that is not too restrictive. *See* 40 C.F.R. § 230.10(a)(2)-(3);

*Grosskruger*, 587 F.Supp.2d at 1243-44.  Plaintiff objects that the Corps' determination that the basic purpose of his project, the construction of a residence with driveway and septic system, are not water dependent ignores the unique purpose for which the site is suited, namely easier boating access and a superior view of the shipping channel.  Plaintiff does not dispute that he already has a waterfront home on the St. Marys River and that he owns two other vacant lots adjacent to the other home.  However, he contends that these upland sites would not fulfill the basic purpose of his property.

The court finds that Plaintiff is defining his project too narrowly.  His specific need for the exact view provided by the subject property results in an elimination of all practicable alternatives.  Although the court acknowledges that Plaintiff's individual property rights are important, it does not follow that Plaintiff's unique and fervent desire for a home constructed on wetlands providing a specific vantage point of the shipping channel warrants overriding the CWA's goal of the protection of wetlands.  The court concludes that the Corps' determination that Plaintiff's precise goal, based on the view provided at Sweets' Point, was too narrow is not arbitrary and capricious.  As other courts have determined, if the project is not water-dependent, i.e., the project is for construction of residential property, then the plaintiff bears the burden of showing a lack of practicable alternatives.  This case resembles *Shoreline Assocs.* more than *Whistler* because Plaintiff proposes to build a residence on the wetland area and not boating access adjacent to an upland residential development.  The basic purpose is therefore the construction of a residential home, which is not water-dependent.  Plaintiff's desire for a specific view of the channel is incidental to the basic purpose of the project–i.e., to build a waterfront home on the St. Marys River.  Therefore, Plaintiff bears the burden of demonstrating that no

practicable alternatives exist.

The Corps determined that Plaintiff failed to demonstrate a lack of practicable alternatives to his project. The court does not find the Corps' conclusion arbitrary or capricious. The Corps noted that Plaintiff had other options for the construction of a waterfront residence, including options on property *already owned by the Plaintiff*. Corps regulations provide that an alternative may be practicable if a plaintiff could obtain other upland property that the plaintiff did not already own. *See e.g.,* 40 C.F.R. § 230.10(a)(1)-(2). The Corps issued its decision and then reevaluated its decision in light of direction from the Brigadier General's appellate administrative decision. Following additional review of the relevant factors, the Corps again determined to deny the permit. The public notice regarding the proposed project elicited several objections from concerned parties, including neighboring landowners, as well as the FWS. The Corps reviewed its history of permit applications and determined that "[a]pplications for discharge of fill waterward of the OHWM for residential development have virtually all been denied by the State." AR 0000032. The Corps determined that Plaintiff's project was waterward of the OHWM.

Although Plaintiff disagrees with the Corps' determination of the OHWM for the site, he does not demonstrate why the Corps' determination is arbitrary and capricious. It is not enough to dispute the Corps' finding. Even if this court disagrees with the Corps' determination, such a disagreement does not warrant overturning the Corps' decision. As long as the Corps' determination can be supported by the evidence, this court will defer to the Corps' determination when it is within the Corps' area of expertise. *See e.g., Frances Broaddus Crutchfield*, 325 F.3d at 218; *Reilly*, 969 F.2d at 1150-51; *Holy Cross Wilderness Fund*, 960 F.2d at 1527.

Throughout his briefing, Plaintiff provides this court with several reasons why his view of the factual evidence is the accurate view and the Corps' view of the evidence is flawed. However, he provides very little citation to analogous cases or even to specific areas in the record in support of his position. Nor does he provide much evidence of the crucial question in this case–i.e., whether the Corps' decision to deny him a permit for the proposed fill on his land was arbitrary and capricious. This is a very high standard to meet, and Plaintiff has not met it here. It is clear that the Plaintiff disagrees with the Corps' determinations regarding its finding of negative impacts caused by the site. It is also clear that Plaintiff objects to the Corps' determination of the OHWM and the Corps' analysis of his proposed septic system. However, Plaintiff does not dispute that he seeks to fill in an area defined as a wetland, and he does not deny that wetlands are subject to special protections under the CWA.

Plaintiff also fails to address the pertinent regulations applicable to the CWA. He admits that the administrative record is accurate, that the Corps has jurisdiction over this area pursuant to the CWA, and that the Corps' citation to and reliance on the statutory and regulatory provisions is accurate. However, Plaintiff disagrees with the Corps' conclusions relating to the site, as well as its determination that Plaintiff has not demonstrated a lack of practicable alternatives. Plaintiff ignores the fact that it is *his burden* to demonstrate the lack of practicable alternatives, not the Corps' burden to demonstrate that such alternatives exist. "Thus, the issue is not, as plaintiff claims, whether the Corps is able to prove the existence of available sites but rather is whether the plaintiff, as the applicant, has provided evidence to prove the unavailability of alternative sites which would be subject to less impact than would be the proposed development. The regulations create a presumption, where the basic purpose of the project is not

water dependant, that practical alternatives, not involving special aquatic sites, exist." *Korteweg*, 650 F.Supp. at 604 (citing 40 C.F.R. § 230.10(a)(3)).

Plaintiff appears to suggest that the highly unique properties of the site, including its boating access and specific view of the shipping channel, make the project site specific and that no other spot will do. However, Plaintiff cites to no statutory provision, regulation or case authority which supports his position that a landowner is entitled to develop property due to the site's inimitable qualities. The unique qualities of the site simply does not relieve the Corps of its duty to protect the nation's wetlands and waterways. Plaintiff has not demonstrated, through legal analysis or citation to appropriate legal authority, that his strong views regarding the unique nature of the site change the basic purpose of the site from one to build a waterfront residential property. His personal idiosyncrasies with respect to the site do not render his desire for a particular view of the shipping channel more than incidental to the basic purpose. *See Grosskruger*, 587 F.Supp.2d at 1243-44; *Sylvester*, 882 F.2d at 409.

It is not as if Plaintiff was unaware of the problems posed by the site at issue. His prior requests for development permits from the state of Michigan and the Corps had been denied, as well as the request of at least one previous landowner. Plaintiff has known for many years that state and federal agencies were reluctant to allow development on the specific site. As the Sixth Circuit noted in another decision upholding the Corps' denial of a permit to construct a home on wetlands, the "plaintiff was aware of the legal hurdles and potential hardships when he purchased the lot." *Smereka*, 1991 WL 188154 at *6.

This court concludes that Plaintiff has failed to demonstrate that the Corps' decision to deny him a fill permit pursuant to 33 U.S.C. § 1344(a) was arbitrary or capricious. For this

-24-

reason, the Court will uphold the Corps' January 2008 decision to deny Plaintiff a permit to fill wetlands on his property.

**IV.     Conclusion**

As summarized *supra*, the court concludes that Plaintiff has failed to fulfill his burden of demonstrating that the Corps' decision to deny his application for a fill permit pursuant to 33 U.S.C. § 1344(a) of the CWA was arbitrary and capricious.  For this reason, the court will uphold the Corps' January 2008 decision to deny Plaintiff's application for a permit for development.

A separate order will enter.


Dated:   __3/5/09_____              _____*/s/ R. Allan Edgar*_____
_____R. ALLAN EDGAR
                                      UNITED STATES DISTRICT JUDGE